UNITED STATES of America,
Plaintiff,

v.

Judith BARNES and Nathan
Genrich, Defendants.

Case No. 3:08–cv–966–J–34MCR.

United States District Court,
M.D. Florida,
Jacksonville Division.

Dec. 13, 2011.

Michael W. May, Washington, DC, for Plaintiff.

Adam Louis Heiden, Keith Howard Johnson, Johnson & Johnson, PA, Jacksonville, FL, for Defendants.

### *ORDER*

MARCIA MORALES HOWARD, District Judge.

**THIS CAUSE** is before the Court on Plaintiff's Motion for Summary Judgment, filed April 22, 2010. (Doc. 30; Motion). Plaintiff, the United States of America, filed this civil action, pursuant to 26 U.S.C. §§ 7401 and 7403, to reduce to judgment the federal income tax liability of Defendants, former spouses Judith Barnes and Nathan Genrich. Plaintiff (or "the Government") seeks to foreclose its federal tax liens and to sell two pieces of real property Plaintiff alleges are owned by Defendant Barnes, located at 10 Riviera Place, Palm Coast, Florida 32137 ("Riviera Property"),[1] and at 3 Anastasia Court, Palm Coast, Florida 32137 ("Anastasia Property"),[2] in partial satisfaction of the unpaid taxes. (Doc. 1; Complaint).[3] Defendant Barnes answered the Complaint, and did not assert any affirmative defenses (Doc. 8; Answer), while Defendant Genrich failed to file an answer. On Plaintiff's motion, the Clerk entered a Clerk's Default against Genrich on December 17, 2008. (Docs. 6, 7).[4] Defendant Barnes filed a response in opposition to Plaintiff's Motion for Summary Judgment on April 26, 2011 (Doc. 45; Response),[5] and the Motion is ripe for review.

1. The Riviera Property, which was purchased by Barnes on August 18, 1995, is described as:

Lot, 13, of the Subdivision plat of GRANDE MER, as recorded in Map Book 29, Page 99, being an amended plat of Section 85, North Raffles Surf Club as recorded in Map Book 23, Pages 41–57, Public Records of Flagler County, Florida.

Complaint ¶¶ 7, 8; Answer ¶¶ 7, 8.

2. The Anastasia Property, which is Barnes' personal residence, is described as:

Lot 2, of Block 1, Map of Granada Estates, Section 1, according to the plat thereof as recorded in Map Book 28, Pages 26–27, being an amended plat of Section 85, at Palm Coast, North Raffles Surf Club, as recorded in Map Book 23, Pages 41–57, Public Records of Flagler County Florida.

Complaint ¶ 9; Answer ¶ 9.

3. "Congress vested in the district courts 'jurisdiction of any civil action arising under any Act of Congress providing for internal revenue.'" *United States v. Christiansen,* 414 Fed.Appx. 218, 220 (11th Cir.2011) (quoting 28 U.S.C. § 1340). The Court has subject matter jurisdiction over the action pursuant to 26 U.S.C. §§ 7402 and 7403, and 28 U.S.C. §§ 1340 and 1345.

4. Plaintiff has not yet filed a motion for entry of default judgment as to Defendant Genrich, in recognition of the fact that the Court could not accurately determine joint tax liability of both defendants until it resolves any challenges that Barnes might make to joint liability. (Doc. 10; Plaintiff's Response to Order to Show Cause at 2).

5. On May 21, 2010, Barnes filed in this case a Suggestion of Bankruptcy, disclosing that she had filed a petition for relief under Title 11, United States Code, in the United States Bankruptcy Court for the Middle District of Florida. (Doc. 33; Suggestion of Bankruptcy). Pursuant to the automatic stay resulting from Barnes' bankruptcy filing, the Court stayed the case on June 23, 2010. (Doc. 36; Bankruptcy Stay). On August 6, 2010, Plaintiff filed a Motion to Lift Stay, stating that on August 5, 2010, the Bankruptcy Court entered an order which would permit this case to proceed. (Doc. 37; Motion to Lift Stay). The Bankruptcy Court's Order allows "the United States to obtain an in rem judgment against the property and the United States shall not seek an in personam judgment against Debtor." (Doc. 37-1; Bankruptcy Court Order). In accordance with the Bankruptcy Court's Order, Plaintiff seeks a ruling on its Motion for Summary Judgment determining the amount of Defendants' 1997 tax liability; a judgment against Defendant Genrich but not against Defendant Barnes, for the amount of

## I. Facts [6]

During the 1997 tax year, Defendants Barnes and Genrich were a married couple. The following year, Defendant Genrich filed a joint tax return for tax year 1997 on behalf of himself and Defendant Barnes.[7] (Doc. 30–1; 1997 Tax Return, or Return, at Line 2). On the Return, Barnes and Genrich reported a total taxable income of $3,302,760, and a total income tax liability of $927,359. *Id.* at Lines 38, 53. The Internal Revenue Service (IRS) processed the return on November 30, 1998. (Doc. 30–2; IRS Account Transcript; Return, Forms 4868 and 2688). At that time, the IRS made a tax assessment against Barnes and Genrich in the amount of $659,019 for 1997. IRS Account Transcript at 2; (*see also* Doc. 30–4; Certificate of Assessments).[8] Plaintiff has submitted a sworn declaration of Revenue Agent Brenda M. Combs verifying the assessment. (*See* Doc. 30–3; Combs Declaration).[9]

Defendants did not make any tax payments for tax year 1997, *see* Return at

Line 60, but the IRS collected some of the unpaid tax through credits applied from different tax years as well as levies. *See* IRS Account Transcript. As of March 1, 2010, Defendants had a tax liability for the 1997 tax year of $1,560,669.25, including statutory interest and penalties.[10] IRS Account Transcript at 1.

## II. Summary of Arguments

Plaintiff argues that the IRS assessment of Defendants' 1997 tax liability and account history, as set forth in the Certificate of Assessments, as well as the IRS Account Transcript, are presumed to be valid and correct. Motion at 5–6. Plaintiff contends that Barnes has failed to present evidence challenging that assessment sufficient to overcome the presumption of validity. *Id.* at 6–14. Accordingly, Plaintiff contends that the United States is entitled to place a tax lien on the Riviera and Anastasia Properties, and to foreclose these tax liens. *Id.* at 14–15.

---

Defendants' 1997 taxes; and an order of foreclosure of the United States' tax liens on the Riviera Property and the Anastasia Property. Plaintiff does not seek a personal judgment against Defendant Barnes at this time. Motion to Lift Stay at 2; (*see also* Doc. 47; Notice at 1). The Court reopened the case on August 30, 2010. (Doc. 38).

6. Because this case is before the Court on Plaintiff's Motion for Summary Judgment, the facts recited herein and all reasonable inferences therefrom have been viewed in a light most favorable to Defendants. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

7. Barnes and Genrich were married in 1971, and were divorced on May 27, 1998. (*See* Doc. 30–7; Barnes Deposition at 8; and Doc. 45–1: Divorce Judgment).

8. The IRS Account Transcript reflects that, according to the IRS, Defendants had a 1997 tax liability on November 30, 1998, of 659,-

019 plus $73,836.17 in interest and penalties, for a total amount due of $732,855.17. IRS Account Transcript at 2.

9. The IRS' Assessment of $659,019 is less than Defendants' self-reported tax liability of $927,359 in the 1997 Tax Return. *See* Return at Line 64. According to Plaintiff, the reduction is likely due to a change in the capital gains tax rate that occurred in the middle of 1997. Combs Declaration ¶¶ 4, 5. Revenue Agent Combs states that she computed the total amount of tax liability Defendants would have owed on their capital gains under the rates in effect at the end of 1997, and her results were consistent with the assessment entered by the IRS on November 30, 1998. *Id.* ¶ 5.

10. Specifically, according to Plaintiff, Defendants owe, as of March 1, 2010, $755,113.12 in unpaid taxes and $805,556.13 in accrued interest for an outstanding balance of $1,560.669.25 for the 1997 tax liability. Motion at 4 (citing IRS Account Transcript).

Defendant Barnes asserts that her former husband, Defendant Genrich, prepared the 1997 Tax Return and submitted it without her reviewing or signing it. She argues that she did not authorize Genrich to sign her name to the 1997 Return, and that "she did not see the 1997 [R]eturn for the first time until June 10, 2000." Response at 3. She cites to her verified response to Plaintiff's interrogatories in which she states that she disputes the propriety, amount, and validity of the IRS's November 30, 1998 assessment of $732,855.17 (which includes interest and penalties). *Id.* at 3–4. Barnes cites to her deposition testimony and to a letter she prepared and sent to Plaintiff, in which she contends that the 1997 IRS assessment does not take into account "losses" incurred in 1997 relating to the sale of property and a business. *Id.* at 4 (citing Doc. 30–7; Barnes Deposition; and Doc. 45–2; Barnes' 10/2/09 Letter). She argues that "the joint and several liability being imposed on her by the Internal Revenue Service is being done so unjustly and that she has no individual liability for tax year 1997." *Id.* In conclusion, Barnes asserts she has demonstrated:

> that she was not aware nor involved in the preparation of the 1997 federal income tax return filed by her ex-spouse Nathan Genrich, that she did not demonstrate an intent to enter into a joint 1997 federal tax return with her ex-spouse Nathan Genrich, that she does accept the fact that the 1997 liability

assessed by the Plaintiff is valid, and that she did not willfully avoid paying her tax liability for the tax year 1997.

*Id.* at 5.

### III. *Standard of Review*

■ Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A).[11] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir.1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004). The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.

---

11. Civil Procedure Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Fed.R.Civ.P. 56 advisory committee's note 2010 Amendments.

The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

*Id.* Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

*See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

██ "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir.1995) (internal citations and quotation marks omitted). Unsworn statements do not meet the requirements of Rule 56, and cannot be considered on a motion for summary judgment.[12] *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1248 n. 8 (11th Cir.2009); *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir.1980).[13] Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir.1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV. Discussion

### A. Assessment

██ " 'In reducing [a tax] assessment to judgment, the Government must first prove that the assessment was properly made.' " *United States v. Korman*, 388 Fed.Appx. 914, 915 (11th Cir.2010)[14](quoting *United States v. White*, 466 F.3d 1241, 1248 (11th Cir.2006)). A tax assessment made by the IRS constitutes a "determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes," and such a determination "is entitled to a legal presumption of correctness." *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242, 122 S.Ct. 2117, 153 L.Ed.2d 280 (2002); *see also Bone v. Comm'r*, 324 F.3d 1289, 1293 (11th Cir.2003) (citing *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933)). A taxpayer challenging the IRS' assessment bears the burden of overcoming this presumption by proving by a preponderance of the evidence that the IRS' computations were erroneous. *Bone*, 324 F.3d at 1293; *United States v. Lena*, 370 Fed.Appx. 65, 69–70 (11th Cir.2010); *Pollard v. Comm'r*, 786 F.2d 1063, 1066 (11th Cir.1986)

██ In support of the Motion, Plaintiff has filed a certified Certificate of Assessments and Payments (Doc. 30–4), reflecting the amounts and dates of taxes owed, payments made by, and penalties assessed against Defendants. The Certificate of Assessments is presumptive and *prima facie* proof of a valid assessment of Defen-

---

**12.** "Federal law does provide an alternative to making a sworn statement, but requires that the statement include a hand-written statement, signed and dated, that the statement is true under the penalties of perjury." *United States v. Goldston*, 324 Fed.Appx. 835, 838 (11th Cir.2009) (citing 28 U.S.C. § 1746).

**13.** In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent deci-

sions of the former Fifth Circuit rendered prior to October 1, 1981.

**14.** "Although an unpublished opinion is not binding ..., it is persuasive authority." *United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir.2000) (per curiam); *see generally* Fed. R.App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

dants' tax debt. *See United States v. Chila*, 871 F.2d 1015, 1018 (11th Cir.1989) (the " 'Court accepts the document 'Certificate of Assessments and Payments' submitted by the government as presumptive proof of a valid assessment' " (citation omitted)). Plaintiff has also filed the affidavit of IRS Agent Combs verifying the IRS's calculations in the Assessment. (Doc. 30–3). Upon this *prima facie* showing, the burden shifts to the taxpayer defendant to establish that the tax assessment is not correct. *United States v. White*, 466 F.3d 1241, 1248 (11th Cir.2006); *see also Helvering v. Taylor*, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935).

■ In her Response in opposition to Plaintiff's Motion, Barnes states that she "does not dispute the legal sufficiency of the assessment made for tax year 1997 based upon the information reported on the return filed with the Internal Revenue Service," Response at 3, and that "she does accept the fact that the 1997 liability assessed by Plaintiff is valid." *Id.* at 5. However, contending that she was not involved in the preparation of the 1997 Return, Barnes appears to question the "accuracy" of the 1997 Return, citing to an October 2, 2009 letter she wrote to Plaintiff's counsel "outlin[ing] various capital losses and/or basis adjustments that were omitted from computation of the 1997 income tax relative to asset sales." *Id.* at 3 (citing Doc. 45–2; Barnes Letter). Additionally, Barnes cites to her verified interrogatory responses in which she states that she disputes the propriety, amount and validity of the $732,855.17 assessment made against her and Genrich on November 30, 1998. *Id.* at 3–4 (citing Doc. 30–6; Barnes' Verified Response to Interrogatories).

In her October 2, 2009 Letter, indicating a lack of knowledge regarding her and her former husband's business dealings, Barnes wrote that "I am only able to give you what I know were some of the losses that were incurred due to the sale of real estate and other occurrences during that tax year." Barnes Letter at 1. Barnes recounted that she and her ex-husband also sold a "manufactured housing community" and a home in 1997. *Id.* As to the home sale, Barnes recounts that an individual placed a lien on the home in the amount of "one hundred eighteen thousand dollars," and the bank, "[t]o my knowledge . . . took over three hundred thousand and if I recall, I think it was actually closer to four hundred thousand dollars on the closing of the home." *Id.* She said that her husband told her that she would recoup $2 million from the sales. She has no knowledge of what the actual profit from the sales was, and testified in her deposition that she realized $800,000, rather than $2 million. Barnes Letter at 1; Barnes Deposition at 31, 35. Barnes wrote that she also suffered a "theft" of household items from a storage unit, and that her Florida residence was flooded in 1995, and she recovered only one-fourth of her insurance claim. Barnes Letter at 1. Barnes' interrogatory response refers to an undated and unspecified newspaper article which "reported that the loss to Nathan Genrich was over $2,000,000," prompting Barnes to question: "Was that reported in the tax return?" Barnes' Verified Response to Interrogatories at 4. Barnes also references "a multitude of losses concerning the business dealings that were deducted from the proceeds of the 1997 sales not reported" in the newspaper article; including a bank lien of "approximately $400,000," a payment to an individual of $118,000, and the loss of a tractor and "other items totaling $30,000." *Id.*

Viewing the evidence in the record in a light most favorable to Defendant Barnes, the Court finds that Barnes has not meet her burden of showing that the Government's assessment of Defendants' tax lia-

bility for 1997 is incorrect, nor has she produced a "corrected" assessment. First, the Barnes Letter is not competent evidence of Plaintiff's alleged miscalculation of Defendants' 1997 tax liability. It is unsworn and is not verified by a declaration or affidavit, nor is it supported by any documentation. As such, it is not competent evidence of the matters discussed therein. Moreover, Barnes' reference to "losses" incurred by Defendants are vague and conclusory, and are not supported by any competent evidence. Barnes fails to identify whether and exactly what "losses" occurred; whether said "losses" are deductible; if deductible, to which tax year the deductions would apply; and if applicable to the 1997 tax year, whether the 1997 Return accounted for the deductions or not. Likewise, Barnes' interrogatory answer referring to an undated and unspecified newspaper article and "a multitude of losses" is not competent evidence of a miscalculation by the IRS.[15] Barnes' deposition testimony regarding liens and "losses" is equally non-specific, vague, and unsupported by competent admissible evidence. *See* Barnes Deposition at 32, 118. Indeed, Barnes concedes that she does not know if the IRS' calculations of her tax assessment are "right or wrong." Barnes Deposition at 16. The "evidence" to which Barnes cites is conclusory, unsubstantiated, based upon hearsay, and lacking in specificity, and thus cannot be considered as competent evidence creating a genuine issue of material fact so as to preclude entry of summary judgment in favor of the Plaintiff. *See e.g. Mays v. United States,* 763 F.2d 1295, 1296, 1297 (11th Cir.1985) (in tax refund suit, taxpayer's computer printout summarizing business expenses and net worth statement were self-serving statements that failed to overcome pre-

sumption of correctness of IRS determination, where statements did not refer to any original records and taxpayer presented no documentation or other evidence; taxpayer's claim that IRS erred "must be substantiated by something other than tax returns, ... uncorroborated oral testimony, ... or self-serving statements"); *Olster v. Comm'r,* 751 F.2d 1168, 1174–75 (11th Cir.1985) (taxpayer "has done little to come forward with information casting doubt on the [IRS'] assessment"); *United States v. Roberts* No. Civ.A. 04–310–CG–L, 2005 WL 1155676, at *3 (S.D.Ala. April 18, 2005) (taxpayer's "bare assertion that some payments 'do not appear to have been credited' is insufficient to create a material question of fact"); *United States v. Mallard,* No. Civ.A. 90–822–CB, 2003 WL 1908424, at *4 (S.D.Ala. March 10, 2003) ("Defendants, by resting upon mere denials, have failed to rebut the Certificates of Assessments and Payments, and sworn declaration submitted by Plaintiff"); *United States v. Mathewson,* 839 F.Supp. 858, 861 (S.D.Fla.1993) (taxpayer's bare assertions that he has not previously seen the tax assessments and that he does not believe that assessment is correct, and that his ex-wife received part of the funds earned, did not overcome presumption of valid assessment); *United States v. Braswell,* No. 84–0089T–S, 1985 WL 5140, at *3 (S.D.Ala. July 24, 1985) (defendant taxpayer's general denials of liability found in defendant's answer, responses to admissions, and answers to interrogatories, "unsupported by tangible evidence" were "insufficient to rebut the *prima* facie case made against him regarding the amount of the tax liability"). Accordingly, absent any competent evidence for the Court to consider in rebuttal of the IRS's presumptive-

---

**15.** Indeed, even if Barnes provided the Court with the referenced newspaper article, it likely would be inadmissible hearsay (or double hearsay) if offered to establish the truth of the matters asserted therein, that is, that Genrich allegedly suffered a $2 million loss. *See United States v. Baker,* 432 F.3d 1189, 1211–12 & n. 23 (11th Cir.2005); Fed.R.Evid. 801(c).

ly valid tax assessment and sworn affidavit submitted by the Plaintiff, the Court concludes that there exists no genuine issue of material fact as to the validity of the tax liability assessment, and thus that summary judgment is due to be entered in favor of Plaintiff as to the amount of Defendant Barnes' liability for the 1997 tax year. *See Chila,* 871 F.2d at 1018 (where defendant offered no evidence to counter the presumption of validity, the court was satisfied that the government had established that the tax liability was properly assessed).

### B. *Intent to File a Joint Return and Failure to Sign Return*

 Defendant Barnes offers several other arguments in an attempt to avoid liability for the 1997 tax assessment. Barnes contends that she was not aware that her ex-husband had prepared the 1997 Return; she did not sign the Return; and she did not have the intent to file a joint return with her former husband. Response at 2–5. She suspects her ex-husband, Defendant Genrich, signed her name on the 1997 Return without her permission, Barnes Deposition at 7–8, and states that she first saw the 1997 Return on June 10, 2000. *Id.* at 13, 44.

Genrich was an accountant, who prepared Defendants' tax returns from the time they were married in 1971, until they divorced in 1998. Barnes acknowledges that she "didn't have much tax knowledge." *Id.* at 8–10. At the time Genrich prepared Defendants' 1997 Return, Defendants had separated and Barnes was living in Florida while Genrich remained in Wisconsin. *Id.* at 7–8, 11. Barnes stated that Genrich "was a CPA and he did the tax returns and I signed them.... So there was never any talk of how it was going to be prepared. He just did them all the time." *Id.* at 10; *see also id.* at 119. Barnes acknowledges that she understood that she had an obligation to file a tax

return for 1997. *Id.* at 11. In this regard, Barnes confirmed that she relied upon Genrich to prepare the tax return for 1997 to fulfill her obligation.

Q. ... What did you do, then, to make sure that in 1997 a tax return was filed for you?

A. I didn't. I just didn't.

Q. ... Were you thinking that Mr. Genrich was going to file the return for you.

A. I was thinking that he was going to prepare it and pay the taxes that were due and that was it.

. . .

Q. So as far as you understood for 1997, Mr. Genrich was going to take care of preparing whatever paperwork needed to be done for both of your taxes and filed with the IRS, is that correct?

A. He was going to prepare them? Yes, yeah.

*Id.* at 11–12. When asked if she knew her husband would prepare a joint return for 1997, Barnes replied:

I don't know the difference between a joint and single. So I don't know what ... I knew that ... you do tax returns. And I didn't know if joint or single at that point were applicable because I don't remember the date of the divorce [May 27, 1998] and whether or not you have to sign at the beginning of the year or the end of the year.

*Id.* at 11; (*see also* Doc. 45–1; Divorce Judgment).

 Section 6013 of the Internal Revenue Code authorizes a married couple to file a joint income tax return. 26 U.S.C. § 6013. When a joint return is filed, both spouses are jointly and severally liable for the taxes due for that year. *Malkin v. United States,* 3 F.Supp.2d 493, 499 (D.N.J.1998) (citing *Estate of Campbell v.*

*Comm'r*, 56 T.C. 1 (1971)). When a tax return is unsigned, it is, as a general rule, considered to be invalid. *Olpin v. Comm'r*, 270 F.3d 1297, 1300 (10th Cir. 2001). However, a judicially crafted exception to such rule provides that where one spouse signs a return and the other does not, the court may conduct "an inquiry as to the intent of the other spouse" to determine whether the return is a joint return or not. *Id.*, at 1301 (citing *Hanesworth v. United States (In re Hanesworth)*, 936 F.2d 583, 1991 WL 114639, at *1 (10th Cir. June 26, 1991) (unpublished opinion), *cert. denied*, 502 U.S. 982, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991)). The question of whether a return is joint or not is a factual one as to the intention of the parties. *Hanesworth*, 1991 WL 114639, at *1; *Gaynes v. United States*, 454 F.2d 1142, 1143 n. 3 (5th Cir.1972); *Sharwell v. Comm'r*, 419 F.2d 1057, 1059 (6th Cir. 1969). If an "income tax return is intended by both spouses as a joint return, the absence of the signature of one spouse does not prevent their intention from being realized." *Estate of Campbell*, 56 T.C. at 12. Thus, for example, " 'where a husband files a joint return without objection of the wife, who fails to file a separate return, it will be presumed the joint return was filed with the tacit consent of the wife.' " *Heim v. Comm'r*, 251 F.2d 44, 45 (8th Cir.1958) (quoting *Howell v. Comm'r*, 175 F.2d 240, 241 (6th Cir.1949)). However, the presumption is not available where the non-signing spouse "refused to sign the joint return." *Olpin*, 270 F.3d at 1301. Thus, depending on the facts of the case, "[t]here can be a binding joint return even though one of the spouses failed to sign the return." *Heim*, 251 F.2d at 45.

In assessing whether the intent to file a joint return exists, the Court considers four factors: "(1) whether the couple has a history of filing joint returns; (2) whether the wife relied on the husband to handle financial matters; (3) whether the wife's income was reported on the joint return; (4) whether the wife filed a separate return." *Malkin*, 3 F.Supp.2d at 499 (citing *Campbell*, 56 T.C. at 1, 12–14). Reviewing the evidence of intent of the taxpayer, a court may determine that the non-signing spouse is jointly liable for the tax liability where the spouse "acquiesced in and gave her tacit consent to the filing of the joint return." *Heim*, 251 F.2d at 47. In *Heim*, the court cited to the non-signing wife's agreement that her accountant husband should take care of the tax return; her delivery of tax data to her husband; the lack of a reason for a refusal to file a joint return; and the absence of an objection by the wife to making a joint return as factors supporting a finding that she acquiesced to the filing of a joint return, even though the husband signed her name without her express authorization. *Heim*, 251 F.2d at 46–47.

Here, Barnes relied upon her ex-husband, an accountant, to prepare the couple's tax returns for the entire duration of their twenty-seven year marriage. Barnes presents no evidence that she ever filed a separate return, or that she objected in any way to the filing of a joint return, including the 1997 Return. Barnes has presented no evidence that she made any effort to file a separate return for 1997. By her own admission, Barnes never objected to the filing of a joint return, and acquiesced to her former husband preparing and filing the 1997 Return as he saw fit. Based on these circumstances, the Court determines, for the purposes of resolving the Motion as to Barnes, that the 1997 Return is a valid joint tax return filed by Defendants Barnes and Genrich, and that Defendant Barnes is liable for the 1997 tax liability assessed based on that Return. *See Malkin*, 3 F.Supp.2d at 500 ("[c]ourts view a married taxpayer's failure to request to file a separate return as a decision to file jointly") (citing *Estate of*

*Miriam Krock v. Comm'r*, 46 T.C.M. (CCH) 1330, 1335 n. 5 (1983)). Indeed, Barnes acknowledges that in 1997 she explicitly relied upon Genrich to prepare the 1997 return and to pay the taxes. *See* Barnes Deposition at 11–12. Such a history supports a finding of a tacit intent to file a joint return for the 1997 tax year. *See Malkin,* 3 F.Supp.2d at 499–500 (evidence established that non-signing wife had relied upon her accountant husband to prepare the couple's joint tax return throughout the duration of their marriage and never filed a separate return); *see also Hanesworth,* 1991 WL 114639, at *2 (non-signing wife's intent to file a joint return found based on testimony that husband handled all the family's financial affairs; there was a consistent pattern of filing joint returns; and wife offered no reason why she would not have signed a joint return had she been requested to do so); *Sharwell v. Comm'r,* 419 F.2d at 1059–60 (determination that non-signing wife knew that the tax returns were being prepared and that she took no active role in helping to prepare the documents led to the conclusion that the tax return was a joint return); *Estate of Campbell,* 56 T.C. at 12–13 (nonsigning wife found to intend joint return where couple customarily filed joint return; wife did not examine the returns but rather simply accepted her husband's preparation of the returns and signed them; by leaving preparation and filing to her husband, she intended the returns to be filed as he chose).

## C. *Willfulness*

 Barnes asserts that the Court should find there are genuine issues of material fact still in dispute and deny Plaintiff's Motion because "she did not willfully avoid paying her tax liability for the tax year 1997." Response at 5. Barnes offers no legal or factual support for why this assertion is relevant, and makes no allegation that her "willfulness" argument is directed toward any interest or statutory additions assessed on the taxes due. Moreover, § 6321 of the Internal Revenue Code which authorizes a tax lien to be placed upon all property rights of a person who "neglects or refuses to pay" taxes due after demand, does not require willfulness. 26 U.S.C. § 6321. Without more, Barnes' argument fails to create a genuine issue of fact to defeat summary judgment for Plaintiff.

 Moreover, the undisputed facts belie Barnes' assertion. Barnes acknowledges that she received $800,000 from the 1997 sale of the home and the business in connection with her divorce, but believed that "with all the money we had lost—or I lost, that there should have been no tax due." Barnes Deposition at 35, 47–49. Barnes stated that she was aware of her 1997 Tax Return, and thus her tax liability by June 10, 2000. Barnes Dep. at 13–14. Since that date, Barnes has been in possession of significant assets, including two pieces of real property and cash. In 2003, Barnes purchased a Corvette automobile, and paid cash for a Volvo in 2010. *Id.,* at 69. She earned $300,000 in both 2008 and 2009 selling real estate, for a total of $600,000, *id.* at 71; and currently she has "20–some–thousand in my savings and checking." *Id.* at 68. There is no dispute that the 1997 tax assessment remains unpaid, and that she has had available to her funds to pay it, or at least some portion of it.

## D. *Validity of Tax Liens*

 When a taxpayer, who is liable to pay any tax, neglects or refuses to pay the tax after demand, the amount becomes "a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. The language of § 6321 " 'is broad and reveals on its face

that Congress meant to reach every interest in property that a taxpayer might have.'" *Drye v. United States,* 528 U.S. 49, 56, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999) (citing *United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 719–20, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985)); *see also May v. United States,* —— Fed.Appx. ——, ——, No. 07–10531, 2007 WL 3287513, at *1 (11th Cir. Nov. 8, 2007), *cert. denied,* 554 U.S. 904, 128 S.Ct. 2943, 171 L.Ed.2d 867 (2008). The lien arises by operation of law "at the time the assessment is made and shall continue until the liability for the amount assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C. § 6322. Thus, the tax lien attaches to all property owned by the taxpayer at the time the lien arises, and also to after-acquired property during the existence of the lien. *Glass City Bank v. United States,* 326 U.S. 265, 267, 66 S.Ct. 108, 90 L.Ed. 56 (1945). "The threshold question in any case involving the federal government's assertion of its tax lien is whether and to what extent the taxpayer had 'property' within the meaning of the federal tax lien statute." *Randall v. H. Nakashima & Co., Ltd.,* 542 F.2d 270, 272 (5th Cir.1976) (citing *Glass City Bank,* 326 U.S. at 267, 66 S.Ct. 108).

 The nature and extent of a taxpayer's property and rights to property are determined in accordance with state law. *Aquilino v. United States,* 363 U.S. 509, 512–14, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); *In re Ready,* 269 B.R. 258, 263 (Bankr.M.D.Fla.2001). The Court is "obliged to 'look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as "property" or "rights to property" within the compass of the federal tax lien legislation.'" *May,* —— Fed.

Appx. at ——, 2007 WL 3287513, at *2 (quoting *United States v. Craft,* 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002)). Thus, while state law delineates the taxpayer's property rights or interests, federal law determines whether those rights or interests constitute "property" or "rights to property" within the meaning of § 6321. *Drye,* 528 U.S. at 52, 120 S.Ct. 474; *see also Old West Annuity and Life Ins. Co. v. Apollo Group,* 605 F.3d 856, 861–62 (11th Cir.2010). "[I]n determining whether a federal taxpayer's state-law rights constitute "'property'" or "'rights to property,'" the important consideration is the breadth of the control the taxpayer could exercise over the property." *Drye,* 528 U.S. at 61, 120 S.Ct. 474 (quotations and citation omitted).

██ Pursuant to 26 U.S.C. § 6323(f), the Government filed a Notice of Federal Tax Lien against the Riviera Property and Anastasia Property, in the public records of Flagler County, Florida, on July 19, 2000, and October 17, 2006, with respect to Defendants' assessed joint and several income tax liability for the 1997 tax year. Complaint ¶ 13; Answer ¶ 13. Enforcement of such lien, however, requires affirmative action by the IRS. *Nat'l Bank of Commerce,* 472 U.S. at 720, 105 S.Ct. 2919. Section 7403 of the Internal Revenue Code authorizes the United States to bring a civil action to enforce a lien or "to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability." 26 U.S.C. § 7403(a); *Nat'l Bank of Commerce,* 472 U.S. at 720, 105 S.Ct. 2919. Such is the purpose of the instant action with respect to the Riviera Property and the Anastasia Property.

██ In the Motion, after addressing Defendant Barnes' arguments with respect to the validity of the tax assessment, Plaintiff argues that the Court should order

foreclosure of it's liens on the Riviera Property and the Anastasia Property. Although Barnes denied, in her Answer, that Plaintiff's tax lien attached to the Anastasia Property because it was "part of the probate estate of Defendant Barnes's mother, Eleanor S. Barnes, deceased," *see* Answer, she failed to address this issue in her Response to Plaintiff's Motion. *See generally* Response. Indeed, in the Response, Barnes only challenged the amount of the 1997 IRS assessment, and her own liability for the delinquent taxes. Defendant Barnes, as the party opposing summary judgment was not entitled to rest upon the mere allegations contained in her Answer. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *Jeffery,* 64 F.3d at 593–94; *Walker v. Darby,* 911 F.2d 1573, 1577–78 (11th Cir.1990). Instead, she was required to go beyond her Answer and, through her affidavit, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that a genuine issue remains for trial. *See Jeffery,* 64 F.3d at 593–94. Here, Barnes has presented no argument or facts at the summary judgment stage of the proceeding to dispute the validity of the tax lien or Plaintiff's right to foreclose that lien, if the 1997 assessment is found to be valid. Nevertheless, the Court, in an abundance of caution, will address each property separately.

### 1. *The Riviera Property*

 The Riviera Property is an undeveloped waterfront lot that was purchased by Defendant Barnes on August 18, 1995. Complaint ¶¶ 7, 8; Answer ¶¶ 7, 8.[16]

According to the Government, there are no encumbrances on the Riviera Property, and none have been asserted here. Complaint ¶ 8; Answer ¶ 8. Barnes does not dispute that she is the true owner of the Riviera Property, and acknowledges that a tax lien has arisen in favor of the Government with respect to the Riviera Property. Complaint ¶ 12; Answer ¶ 12.

### 2. *The Anastasia Property*

 The Anastasia Property was originally purchased by Eleanor S. Barnes, the mother of Defendant Barnes, on March 30, 2001, for approximately $575,000. There is no mortgage on the property. On November 27, 2001, Eleanor S. Barnes transferred the Anastasia Property to the Eleanor S. Barnes Trust.[17] Complaint ¶¶ 15, 16; Answer ¶¶ 15, 16.

> At the time of the transfer, Eleanor Barnes was the trustee of the Eleanor S. Barnes Trust, and Defendant Barnes was the successor trustee to the Eleanor S. Barnes Trust in the event that Eleanor S. Barnes died or was otherwise unable to perform the duties of the trustee. The deed transferring the property to the Eleanor S. Barnes trust did not list any beneficiaries of the Eleanor S. Barnes Trust.

Complaint ¶ 17; Answer ¶ 17. "The deed transferring the property to the Eleanor S. Barnes Trust names Defendant Barnes as the successor trustee upon the death of Eleanor S. Barnes. Complaint ¶ 18; Answer ¶ 18.

Eleanor S. Barnes died on December 5, 2007, and Defendant Barnes became the

---

**16.** "A fact admitted by answer is no longer a fact in issue." *Hill v. Federal Trade Comm'n,* 124 F.2d 104, 106 (5th Cir.1941). "[A] party is bound by the admissions in his pleadings." *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.,* 713 F.2d 618, 621 (11th Cir.1983). Judicial admissions are facts "beyond the need of evidence to prove them."

*Hill,* 124 F.2d at 106; *see also Shuler v. Ingram & Assocs.,* 441 Fed.Appx. 712, 718–19 (11th Cir.2011).

**17.** The deed of the transfer is recorded in the public records of Flagler County at Off. Rec. 0785, Page 1429. Complaint ¶ 16; Answer ¶ 16.

trustee of the Eleanor S. Barnes Trust. Complaint ¶ 18; Answer ¶ 18. Barnes has resided at the Anastasia Property since it was first purchased in 2001, and continues to reside on the property. Complaint ¶¶ 5, 15; Answer ¶¶ 5, 15, 19. Barnes admits that "some property taxes and other yearly expenses have been paid in whole or in part" by her, including a new roof, costing $32,000, and property taxes. Answer ¶ 19; Barnes Deposition at 68, 71, 72. According to the Government, there are no encumbrances on the Anastasia Property, and none have been asserted here. Complaint ¶ 15; Answer ¶ 15.

Barnes does not contest, in her Response to Plaintiff's Motion, that a tax lien has attached to the Anastasia Property because of the status of the Eleanor S. Barnes Trust or her mother's Estate. However, she did not admit the actual attachment of the lien in her Answer. Answer ¶¶ 12, 13. Notably, neither party briefed the issue of whether the Government's tax lien properly attached to the Anastasia Property, nor did they submit in the record the Eleanor S. Barnes Trust documents or the deed of conveyance of the Anastasia Property to the Trust. Nevertheless, the admissions by Barnes and her deposition testimony are sufficient to determine whether the Anastasia Property was properly attached.

Defendant Barnes admits that upon the death of her mother, on December 5, 2007, Barnes became the successor trustee of the Eleanor S. Barnes Trust, which has no beneficiaries, and which is a publically recorded Trust holding the deed to the Anastasia Property. Barnes acknowledges that she is subject to Florida Statutes section 689.071 and all other applicable Florida statutes and controlling case law. She denies that the Government's tax lien has attached to the Anastasia Property "because the property is presently a part of the probate estate of Defendant Barnes's

mother, Eleanor S. Barnes, deceased." Answer ¶¶ 12, 13, 18.

In the Complaint, Plaintiff alleges that pursuant to section 689.071, Florida Statutes, "when a deed conveying property to a trust fails to name the trust's purposes or beneficiaries, the property rights vest in the trustee," and that when Barnes became successor Trustee of the Eleanor S. Barnes Trust, "the rights to all property in the trust, including the Anastasia property, vested in Defendant Barnes." Complaint ¶ 18. However, because Plaintiff also asserts that Barnes is the legal owner of the property because the trust does not name any beneficiaries, *see* Complaint at ¶ 18, it is unclear from Plaintiff's Complaint whether Plaintiff is relying on Florida Statute section 689.071, or section 689.07(1).

 Florida Statute section 689.071, which is entitled The Florida Land Trust Act, provides, in part, that a " 'Trustee' means the person or entity designated in a trust instrument to hold legal and equitable title to property of a land trust," Fla. Stat. § 689.071(2)(e), and that the conveyance of a deed to real property to a land trust is effective to vest in the trustee "both legal and equitable title, and full rights of ownership, over the real property or interest therein...." Fla. Stat. § 689.071(3); *see also Goldman v. Mandell,* 403 So.2d 511, 512 (Fla. 5th DCA 1981). "Each successor land trustee appointed is fully vested with all the estate, properties, rights, powers, trusts, duties, and obligations of the predecessor land trustee." Fla. Stat. § 689.071(9)(e). Adopted as a method to encourage land development, section 689.071 "permits the trustee to convey freely without the joinder of spouses or beneficiaries and allows third persons to deal with the trustee without having to inquire into his authority." *Taylor v. Richmond's New Approach*

*Ass'n, Inc.,* 351 So.2d 1094, 1095 (Fla. 2d DCA 1977). There are some conceptual differences between a land trust and a typical inter vivos or testamentary trust: "[i]n the case of an ordinary trust, if the trust property is real property the interest of the beneficiaries is usually considered to be real property.... Under section 689.071, the interest of the beneficiaries ... is considered personal property if so specified ... [and] the trustee is vested with full rights of ownership over the real property." *Id.,* at 1096; *see also Lawyers' Title Guar. Fund v. Koch,* 397 So.2d 455, 457 (Fla. 4th DCA 1981) (citation omitted). Accordingly, if the instrument establishing the Eleanor S. Barnes Trust effectively established a land trust pursuant to Florida Statute section 689.071, Defendant Barnes, as successor trustee of the Eleanor S. Barnes Trust, holds legal and equitable title to the Anastasia Property. Fla. Stat. § 689.071(3); *see also Salkin v. Slobodinsky (In re Saber),* 233 B.R. 547, 552–53 (Bankr.S.D.Fla.1999) (trustee held the legal and equitable interest in the real property of the land trust); *Mayo v. Barnett Bank of Pensacola,* 448 F.Supp. 250, 252 (N.D.Fla.1978) (the trustee of a land trust under Section 689.071 "is the owner of the real property" of the trust).

 Section 689.07(1), Florida Statutes, addresses when the word "trustee" or "as trustee" is added to the name of a grantee. Under Section 689.07(1), "a deed that simply refers to the grantee as 'trustee' conveys a fee simple estate in Florida with three exceptions. These three exceptions are: (1) the deed names the beneficiaries or states the nature and purpose of the trust; (2) the deed expresses a contrary intention; or (3) a declaration of trust is of record." *Raborn v. Menotte,* 974 So.2d 328, 331 (Fla.2008) (construing

Section 689.07(1)). Thus, "[u]nder Florida law, when a grantee of property is named as a trustee in a deed that does not identify the beneficiaries, the nature and purpose of the trust, or the trust agreement of record, the grantee receives fee simple title to that property, unless a contrary intention appears in the deed or conveyance." *United States v. Romano,* 757 F.Supp. 1331, 1336–37 (M.D.Fla.1989) (citing Fla. State § 689.07(1) and *Glusman v. Warren,* 413 So.2d 857, 858 (Fla. 4th DCA 1982)). The statute "'prevents "secret trusts" that impede the exchange of marketable title by vesting both the legal and beneficial interest in the trustee, unless a contrary intention appears in the deed or conveyance, or a declaration of trust is recorded.'" *Raborn,* 974 So.2d at 332 (citation omitted). Section 689.07(1) was "enacted to protect persons who rely upon the public land records to obtain title to real property when a beneficiary's interest is not disclosed ...." *Kapila v. Dye (In re Schiavone),* 209 B.R. 751, 754 (Bankr. S.D.Fla.1997).[18]

Here, the deed, conveyance and trust documents are not available in the record to enable the Court to evaluate whether or not circumstances are such as to create fee simple ownership in Defendant Barnes, pursuant to Section 689.07(1), or whether the conveyance of the Anastasia Property to the Trust specified that it was a land trust made in conformity with the provisions of Section 689.071. However, it is undisputed that the deed to the Anastasia Property was conveyed to the Eleanor S. Barnes Trust; that Barnes is now the Trustee of the Trust; that there are no beneficiaries of the Trust; and that the Trust, "as the holder of the Anastasia property is subject to the terms and condi-

---

**18.** The Court notes that Plaintiff alleged Defendant Barnes admitted that the original deed of transfer of the Anastasia Property to the Trust was recorded in the public records. Complaint ¶ 16; Answer ¶ 16.

tions of the trust and all applicable Florida statutes and controlling case law." Answer ¶ 19.

 Florida trust law provides as follows:

[U]pon the establishment of a trust, the legal title is held by the trustee whereas the equitable title rests with the beneficiary. *In re Grieves*, 250 B.R. 405, 406 (Bankr.M.D.Fla.2000). The law is firmly established in Florida that a trust cannot exist where the legal and equitable interests of the trust are vested in one individual. [Footnote omitted.] *See Reid v. Barry*, 93 Fla. 849, 112 So. 846 (1927); *Axtell v. Coons*, 82 Fla. 158, 89 So. 419 (1921). "If there is no separation of these interests, the doctrine of merger may apply and the trust [may] be terminated." *Contella v. Contella*, 559 So.2d 1217, 1218 (Fla. 5th DCA 1990) (quoting *Axtell*, 89 So. at 420). The rationale behind the merger doctrine holds that "[w]hen the trustee is the only beneficiary, the trust is no longer needed to carry out the intention of the settlor." *Salkin v. Slobodinsky (In re Saber)*, 233 B.R. 547, 553–54 (Bankr. S.D.Fla.1999). [Footnote omitted.] The merger doctrine is applicable where either the entire beneficial interest passes to the trustee or where the legal title passes to a sole beneficiary. *Contella*, 559 So.2d at 1219. Upon merger of the legal and equitable titles, the holder of both interests possesses fee simple ownership of the property. *Saber*, 233 B.R. at 555.

*Grant v. Wells (In re Wells)*, 259 B.R. 776, 779 (Bankr.M.D.Fla.2001).[19] "[F]or the doctrine of merger to apply, the legal and beneficial interests must be completely coextensive; if other equitable interests remain, the trust will not terminate." *Hansen v. Bothe*, 10 So.3d 213, 216 (2d DCA 2009) (citing *Denver Found. v. Wells Fargo Bank, N.A.*, 163 P.3d 1116, 1125 (Colo.2007)); *see also Miller v. Kresser*, 34 So.3d 172, 177 (Fla. 4th DCA 2010) (" 'merger applies only when the legal and equitable interests are held by one person and are coextensive and commensurate— *i.e.*, the legal estate and the equitable estate are the same' " (citation omitted)). "The merger doctrine applies to all types of trusts, including land trusts." *In re Wells*, 259 B.R. at 779 n. 3 (citing *In re Saber*, 233 B.R. at 554 (trustee and sole beneficiary of Florida land trust held both legal and equitable interest in land trust, and thus legal and equitable interests merged, resulting in termination of the trust under the merger doctrine, and the holder of both interests possesses fee simple ownership to the property)). Thus, regardless whether the Eleanor S. Barnes Trust is a land trust or a conventional trust, Barnes assumed legal and equitable title to the Trust's assets, including the Anastasia Property, when she became successor trustee on December 5, 2007, and where there are no beneficiaries, remainder beneficiaries or replacement trustees. *See Hansen*, 10 So.3d at 216.

A federal tax lien arises at assessment and demand. The lien attaches to all

---

**19.** The rationale for the merger doctrine is as follows:

"It is contrary to the conception and purpose of a trust that the person designated as trustee be given absolute and unrestrained control over the property with the right to sell and use the proceeds of the sale as he may *see* fit without liability or accountability to a [beneficiary]. The purpose of a trust is to provide someone to hold and manage

the trust property or funds derived therefrom for the benefit of some person or persons to whom he shall be accountable, not only for the specific trust property, but for the proceeds of its sale, its accretions, its earnings, and any and all funds coming into his hands from, by, and through the property of which he is the trustee."
*In re Wells*, 259 B.R. at 779 n. 4 (quoting *In re Saber*, 233 B.R. at 554 (quotation omitted)).

property or rights to property of the taxpayer, including property acquired after the date of the assessment, and continues until the tax liability is satisfied or becomes unenforceable because of the lapse of time. *United States v. Romano*, 757 F.Supp. at 1337 (citing 26 U.S.C. §§ 6321–6322); *see also Glass City Bank*, 326 U.S. at 267, 66 S.Ct. 108 ("a continuing lien covers property or rights to property in the delinquent's hands at any time prior to expiration"). Regardless whether the Eleanor S. Barnes Trust is a land trust pursuant to Section 689.071, an unrecorded "trust" with no stated purpose or beneficiaries vesting fee simple ownership in the grantee pursuant to Section 689.07(1); or an intervivos trust which merged and terminated, Defendant Barnes holds both legal and equitable title in the Anastasia Property. Accordingly, there is no genuine issue of fact that the Government's tax lien arising out of Defendant Barnes' tax liability properly attaches to the Anastasia Property.[20]

### E. *Foreclosure*

■ Pursuant to 26 U.S.C. § 7403, Plaintiff seeks to enforce its tax liens on the Riviera and Anastasia Properties by foreclosure and sale. "[D]istrict courts have the right to order the sale of property encumbered by a tax lien, 26 U.S.C. § 7403, and 'to render such judgments and decrees as may be necessary or appropriate' to complete that sale, *id.* § 7402(a)." *United States v. Christiansen*, 414 Fed. Appx. 218, 220 (11th Cir.2011); *see also United States v. Todd*, No. 5:05–cv–343–Oc–10GRJ, 2008 WL 2199873, at *3 (M.D.Fla. Mar. 19, 2008). "[I]n all cases where a claim or interest of the United States therein is established, [the court] may decree a sale of such property . . . ." 26 U.S.C. § 7403(c).[21] In consideration of the record in this action, the Court concludes that Plaintiff is entitled to foreclosure of its lien by sale of the Riviera Property and the Anastasia Property.

In light of the foregoing, it is hereby

**ORDERED:**

1. Plaintiff United States of America's Motion for Summary Judgment (Doc. 30) is **GRANTED**.

2. Defendant Judith Barnes is indebted to Plaintiff United States of America for unpaid federal income taxes for the tax year 1997, in the total amount of $755,113.12 in unpaid taxes and $805,556.13 in accrued interest and penal-

---

**20.** In the Complaint, Plaintiff alternatively asserted that "if the Anastasia Property is in a trust, the trust holds the property as the nominee of Defendant Barnes." Complaint ¶ 19. Barnes did not admit or deny this allegation, instead admitting certain of the factual allegations, upon which Plaintiff relied to support the assertion. However, none of the material facts regarding the timing and circumstances of Barnes' receipt of the property, her use or control of the property, or her relationship to Eleanor Barnes and the Trust are in dispute. The Court is of the view that the undisputed facts amply support a finding that if the Trust holds the property, it does so only as a nominee. *Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 729 (11th Cir.1989); *May v. A Parcel of Land*, 458 F.Supp.2d 1324, 1338 (S.D.Ala.2006). However, in light of the Court's previous determination with respect to the Trust, the undersigned will not address this argument further.

**21.** Section 7403(c) provides in part:

The [district] court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and in all cases where a claim or interest of the United States is established, may decree a sale of such property . . . and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States.

26 U.S.C. § 7403(c).

ties for an outstanding balance of $1,560.669.25, as of March 1, 2010, plus further interest and statutory additions as allowed by law, to the date of payment.[22]

3. The United States has a **VALID TAX LIEN,** notice of which have been filed in the public records of Flagler County, Florida, upon two parcels of property, one located at 10 Riviera Place, Palm Coast, Florida 32137, more fully described as:

> Lot, 13, of the Subdivision plat of GRANDE MER, as recorded in Map Book 29, Page 99, being an amended plat of Section 85, North Raffles Surf Club as recorded in Map Book 23, Pages 41–57, Public Records of Flagler County, Florida,

and the second located at 3 Anastasia Court, Palm Coast, Florida 32137, and more fully described as:

> Lot 2, of Block 1, Map of Granada Estates, Section 1, according to the plat thereof as recorded in Map Book 28, Pages 26–27, being an amended plat of Section 85, at Palm Coast, North Raffles Surf Club, as recorded in Map Book 23, Pages 41–57, Public Records of Flagler County Florida.

4. Plaintiff United States of America is entitled to **FORECLOSE** its federal tax liens on the two parcels of real property described in paragraph 3 above, sell the property, and apply the sale proceeds to the payment or partial payment of Defendant Barnes' outstanding federal income tax liability, as will be reflected in the forthcoming Judgment.

5. A Judgment and Order of Foreclosure will be entered separately. The Plaintiff shall file, on or before **January 17, 2012,** a proposed Judgment, containing an up-to-date computation of amounts owed on the tax debt, supported by an affidavit explaining the computation; a proposed Order of Foreclosure, and a proposed Order of Sale setting forth the details of the sale.

6. Plaintiff shall seek a default judgment as to Defendant Nathan Genrich, under Fed.R.Civ.P. 55(b), on or before **January 17, 2012,** or Defendant Genrich will be dismissed for failure to prosecute.

22. At this stage of the proceedings the Court has not determined the liability of Defendant Genrich. In the event he is found responsible for such taxes, any judgment of indebtedness would be joint and several as to Defendant Barnes and Defendant Genrich.